Caldwell, J.
Stevens was the engineer on one of the trains of cars of the Little Miami Railroad Company. The upward and downward trains of cars had, previous to August 13, 1846, passed each other at Plainville, about nine miles from Cincinnati. A change of the place of passing had been determined on, namely, that the cars should pass at Columbia, instead of Plainville, the two places being about three miles apart. This change was to take place on August 13,1846, the day on which the collision occurred. It is the universal custom of the company, when a change of this kind takes place, to give the engineers a printed card, setting forth the times of starting, places where the cars are to pass, time of running, etc., containing the change that has been made. Oa the day on which the collision took place, the plaintiff, Stevens, was the engineer on the upward train from Cincinnati to Springfield, and George Smith was the conductor. On the route, the conductor, according to the rules of the company, is the commanding officer, so far as determining when the cars shall start and stop, etc. The upward train came in collision with the downward train, about seven miles from Cincinnati, ^between Columbia and Plainville, and Stevens was very much injured by scalding; his recovery was doubtful for some time; he was confined for months, and has been injured for life. The engineer and conductor of the downward train had received their cards, stating the change, and they were running in accordance with it, expecting to pass the upward train at Columbia. There is no evidence that Stevens had received a card stating the change; indeed, it is clearly inferable, from the evidence, that he had not. Paul Hues-ton, who was the baggage-master on the train, states, that, at the time of the collision, he had heard nothing about the change; he-also states, that, at the time the collision took place, A. H. Lewis, who was an officer of tho company (in what capacity does not appear), took out of his pocket two cards, and handed them to him, and told him to give one of them to Stevens, the engineer, and the other to Smith, the conductor. N. Morrill, the chief clerk, testifies, that, on the morning of the day on which the collision took place, Thomas L. Cole, an assistant in the engineering de *366 partment, handed to Smith, the conductor, a time-card, and that Smith showed it to him, witness, after he had received it; he says he knows of no card being delivered to Stevens. Isaac West states, that, when the cars reached Columbia, Stevens stopped; that Smith, the conductor, went forward through the cars and asked him why he stopped; that Stevens inquired of him whether the change did not take place that day, and the cars pass there; that Smith replied that the change did not take place on that day, but named a subsequent day on which it was to take place ; Smith then told Stevens to go on, and the cars immediately proceeded.
Other witnesses speak of the stoppage of the cars at Columbia, and also of seeing Smith in the attitude of conversation with Stevens, but they did not hear what, if anything, was said. One witness states that he saw Smith give the motion of the hand to Stevens to proceed.
The cause was submitted to the jury, who found a verdict for the plaintiff. The defendant moved for a new trial, and *also an arrest of judgment, which motions were overruled, and judgment entered on the verdict. The defendant took a bill of exceptions, in which the evidence is set forth, as well as a number of charges, which were asked to be given by the court to the jury by the defendant, which were refused by the court.
The main question arises on the refusal of the court to charge on a single point, and on the charge affirmatively given on the same point; and although this question is presented indifferent forms by the charges asked, yet, we think it is fully presented by the second charge asked and refused, which reads as follows: “That where two or more persons are employed by one individual or company, and in doing the work they are employed to do, one of them, by his negligence and inattention to his duties, causes an injury to the other, no action can be sustained against the employer, whether he be an individual or a company.”
The proposition here stated, and contended for on the part of the company, is, that whilst it is admitted that the company would be liable to the fullest extent for an injury done to a person having no connection with the company, by the negligence of one of their agents, yet that Smith and Stevens, both being in the employ of the company, the company would not be liable for an injury done *367 to Stevens, through the negligence of Smith and the other agents of the company.
It is a general rule that a person in the management of his business, whether he does it himself, or acts through agents, must so conduct that business as not to interfere with the rights of, or produce injury to others. This devolves on the party care and prudence in the management of his business, and renders him. civilly responsible for any injury that may result to others from the want of such care and prudence, whether the injury may be done under his own immediate supervision, or under the control of agents. This doctrine is founded in reason. What can be more reasonable than that he who puts any power in motion for his own benefit, which, from its nature, may be destructive to the property and life of ^others, if not carefully managed, should be accountable for such injury as may be caused by the careless management of such power ? An injury has been done; it has fallen on a party who is guilty of no wrong, no carelessness ; it has been done by a force put in motion by a party who has caused the injury by his careless management. On whom shall the loss fall ? On the innocent person who had no control or management of the thing that produced it ? Or shall it not rather fall on the person who put the power in motion, for whose benefit it moves, who is in duty bound to provide for its proper management, who selects his agents, controls their movements, and who gives them their authority to act?
Indeed, the rule is not only a reasonable one, that the employer should makegood the injuries thus done by the carelessness of his agents; but it is necessary as a preventive of mischief, and a protection to community, that it should be strictly adhered to. The rule is founded on the principles of justice between man and man, and abstractly considered, is of universal application. There must be some good reason for taking any case without its application.
It is said, however, that when a party contracts to perform services, he takes into account the dangers and perils incident to the employment, and receives wages accordingly. Take this for granted; and we think it falls far short of sustaining the main proposition. If the party does contract in reference to the perils incident to the business, he will only be presumed to contract in reference to such as necessarily attend it when conducted with *368 ordinary care and prudence. So far as an implied contract, in reference to the business, will be presumed, it will be on the hypothesis that the business is to be properly managed. He can not be presumed to have contracted in reference to injuries inflicted on him by negligence—by wrongful acts. An express stipulation would at least be necessary to make it a part of the contract. The employer has paid him no money for the right to break his legs, or, as in this case, to empty on him the contents of a boiler of scalding water. It *was not the expectation, when the company hired Stevens, that the two trains should run by different cards and thus come in collision.
When a man employs another to do work for him, each incur their obligations. The person hired is bound to perform the labor according to the agreement, and the employer is bound to pay;, besides that, neither party has parted with any of his rights. The employer has no more control over the person he has employed, outside of the service to be rendered, than he has over the person of any' other individual; and .is equally accountable for an Injury to it.
In this case the evidence leads the mind irresistibly to the conclusion that Stevens had not received a card, or any certain information that the change was to take place on the day of the collision. The effects of a collision are so dangerous, that it was certainly the duty of the company to furnish him with that information ; without such information he, as a matter of course, would run by the card that he had formerly been running by, which would placo the trains in danger of a collision. It would appear from the evidence that he had heard something of it, but ho was told by Smith, the conductor, that the change was not to take place on that day, and to proceed. Ho obeyed, and suffered the injury in consequence.
It is said that Stevens was guilty of negligence himself, in not stopping at Columbia. And further, that he was negligent in running as fast as he did, and not keeping a man on ahead to give notice of the approach of a train, he, Stevens, having reason, as is alleged, to believe that they were in danger of meeting the other train. And several charges were asked as to what would constitute negligence on his part; some of these charges the court overruled, and which ruling of the court is assigned for error.
When we take into account the fact that Stevens had not *369 received the ordinary notice of the change, and the fact that he was told that the change did not take place until a subsequent day, by the person who had the control of the cars, and *the right to give him his orders as to running and stopping, we do not think that there was evidence showing negligence on his part; and that charge, from the state of evidence, was immaterial. Stevens had engaged to labor for the company in a subordinate capacity; he has received the injury from the negligence of those placed over him by the company, as the jury have found, and we do not see why the company aro not liable to him for the amount of the damage he has sustained.
It is contended, however, on the part of the company, that public policy forbids the right of a party to bring suit against his employer for an injury by another in the same employ, because it is supposed that it will lead to carelessness on the part of those employed, when they know that they can recover for any damage that they may receive. In answer to this, it may be remarked that it is only where the person has been careful himself, that any right of action accrues in any case. Besides, we do not think it likely that j>ersons would be careless of their lives and persons or property, merely because they might have a right of action to recover for what damage they might prove they had sustained. If men are influenced by such remote considerations to be careless of what they are likely to be most careful about, it has never come under our observation. We think the policy is clearly on the other side. It is a matter of universal observation, that in any extensive business, where many persons are employed, the care and prudence of the employer is the surest guaranty against mismanagement of any kind. The employer would, we think, be mud) more likely to be careless of the persons of those in his employ, since his own safety is not endangered by any accident, when he would understand that he was not pecuniarily liable for the careless conduct of his agents. Indeed, we think that those who have others in their employ are under peculiar obligations to them to provide for their safety and comfort, and we think they should at least bo held legally responsible to them as much as to a stranger.
*We could easily suppose a case where two persons employed by the same individual, and standing on a perfect equality —where the business was managed as much by one as the other—■ *370 •where they would stand on the same footing as men in the community generally do—in which the employer would not be liable for an injury done to one by the negligence of the other. But we regard this case as standing on entirely a different footing.
Among other cases, we have been referred to those of Farrell v. The Boston and Worcester Railroad Corporation, 4 Met. 49, and Murray v. South Carolina Railroad Company. The case in 4 Met-calf denies the right of recovering principally on two grounds, namely, that the person employed contracts with reference to the perils of the employment; and that he receives a compensation, in the way of wages, for such perils, and therefore he can not recover ; and that it would be contrary to public policy to permit a recovery, as the tendency would be to produce carelessness on the part of persons thus employed. The decision in 1 McMullen appears to be based principally on the first of these two propositions. We have noticed both of these propositions in our previous remarks. In both cases, much stress is laid upon the fact that no precedent, of a recovery under such circumstances, is to bo found. It is to be noticed, that in both of these cases the facts differ in some particulars from the present; we must admit, however, that the reasoning in those cases would cover the one now before us. So far as those cases decide that a recovery can not be had in a case like the one now before the court, we think they are contrary to the general principles of law and justice, and we can not follow them as precedents. The court, then, are of the opinion that there was no error in the charge of the court, and that the evidence warranted d recovery on the part of Stevens.
The judgment will therefore be affirmed.
. Hitchcock, C. J., prepared au opinion expressing his views of this case.
^Spalding, J., dissented, and delivered his opi-
nion.
The opinions aforesaid follow :